ROSS ET AL. *v.* THE STATE OF OHIO.

(Decided February 17, 1930.)

*Messrs. Meck & Meck,* for plaintiffs in error.
*Mr. Leroy W. Hunt,* prosecuting attorney, and *Mr. Cecil Stickney,* for defendant in error.

LLOYD, J. At the September term, 1929, of the court of common pleas, an indictment was returned charging that Harry Ross, Joe Duquette, and Orlando Trabbic did, on October 24, 1929, in Lucas county, Ohio, unlawfully and forcibly make an assault upon one Marcheta Scholtez and then and there unlawfully, forcibly by violence, and by putting her in fear, did steal, take, and carry away from her person and against her will, and with the intent unlawfully to steal the same, certain money of the amount and value of $100. Trabbic not having been apprehended, Ross and Duquette, having pleaded not guilty, were tried on this indictment, a verdict of guilty as charged in the indictment being returned against them. Duquette was sentenced to the State Reformatory and Ross to the Penitentiary. They now seek to reverse the judgment of the court of common pleas, claiming as error that the court permitted the prosecuting attorney to ask improper questions of jurors on their *voir dire* and refused to charge, upon request therefor, the included offenses of assault with intent to commit robbery, assault and battery, and assault. It is also charged as error that the prosecuting at-

torney was guilty of misconduct in his closing argument to the jury.

The first charge of error is not well taken, for the all-sufficient reason that counsel for plaintiffs in error did not exercise all of his peremptory challenges, and, before the jury impaneled was sworn, upon inquiry by the trial judge, replied, "The defense is satisfied." Whether or not the refusal of the court to charge with respect to the alleged included offenses was error depends entirely upon the character of the evidence produced at the trial.

The evidence shows that the three men indicted went with three women to a roadhouse known as the Bluebird Inn for dinner, arriving there about 9 o'clock p. m., on October 24th; that while there they ate and drank and danced. Frank Wilkinson conducted the place, but at the time of the alleged robbery was absent, having left it in charge of Marcheta Scholtez. If Marcheta Scholtez is to be believed, Ross placed a "gun" against her side, ordering her to go upstairs to look for Wilkinson and to unlock the door to his room, and when she said she could not, because she had no key, told her that she was lying, and then, she says, he "turned me around and started me back downstairs, and when he did, he kept hitting me in the back with his fists, and I had black and blue marks where he hit me."

When they were again downstairs, she says, Ross ordered her into the kitchen, where the cash register was kept, whereupon he went to the cash register, opened it, and took out the money therein, amounting she thinks to $102, that being the sum that was there when she last counted it at 12 o'clock. On cross-examination she stated that Ross did not

force her to take the money from the register, but poked a gun at her while he took it. Ross, when arrested, had $99 in his pocket, but the evidence was in conflict as to the number and denomination of the bills as compared with those claimed to have been in the cash register. Wilkinson had not opened the cash register since about 10:30 p. m., when he says about $100 was there. There was no other testimony offered by the state, other than the testimony of the officers who arrested Duquette and Ross, and of the "piano player," who says that "some one," he thinks Ross, "grabbed me by the shoulders and told me * * * I should keep on playing and nothing would happen to me; I turned around and the room was empty and I heard some scuffling towards the kitchen and some one said 'Get in there,' and I heard the kitchen door shut. * * * There was no one in the hall, so I went out the front door."

Marcheta Scholtez says also that she tried to get out of the back door when Ross and Trabbic went after Heindel, the piano player, who was going out the front door, and that Duquette "met me at the back door with his gun and told me to get back in the kitchen, cursing me all the time; he had a gun and told me to get back in the kitchen, so I went back there."

The foregoing was the substance of all of the evidence offered by the state.

The evidence shows that Marcheta Scholtez, Frank Wilkinson, and the members of the dinner party were all well acquainted, and that apparently none of them bore any too good a reputation. Duquette and two of the three women at the dinner party testified in behalf of the defendants, and their

testimony tended to disprove the facts as told by the witnesses for the state. In our judgment the facts and circumstances disclosed by the evidence were such that the jury might have returned a verdict of not guilty of robbery, as charged, but guilty of assault with intent to commit robbery, or of assault and battery. In other words, the evidence was such that the jury might have believed all, or part, or none, of the story told by Marcheta Scholtez. *People* v. *Allen,* 32 Cal. App., 110, 162 P., 401; *People* v. *Blanchard,* 136 Mich., 146, 98 N. W., 983. We think the evidence in the instant case differs from that in the *Lempke case* cited by the prosecuting attorney and found in 36 Court of Appeals Opinions, Sixth District, unreported. In the *Lempke case* the assault and battery was incidental to and inherent in the act charged, and there was no evidence from which to disassociate the one from the other. In that case the evidence warranted only a verdict of guilty or not guilty of the crime charged in the indictment.

The line of demarcation is not always easy of ascertainment, but onerous as it may be, it is one of the burdens cast upon the trial judge to determine in each particular case from the evidence adduced. *Bandy* v. *State,* 102 Ohio St., 384, 131 N. E., 499, 21 A. L. R., 594; *Windle* v. *State,* 102 Ohio St., 439, 132 N. E., 22.

Our conclusion is that the trial court erred to the prejudice of plaintiffs in error in refusing to charge the jury as to the included offenses of assault with intent to commit robbery and assault and battery.

Some evidence was offered in behalf of the plaintiffs in error that the waitress who served their din-

ner was unable to change a $20 bill offered in payment of the dinner check of $9, and that thereupon she was given a $10 bill, of which $1 was given her as a tip.

In his argument to the jury counsel for plaintiffs in error commented on the above evidence, and on the fact that Ross was not called as a witness, in the following language: ''We introduce that evidence. Did they produce the waitress to deny it? Don't you have to believe it, if we put that evidence in by different witnesses and they won't deny it. * * * Well now, my good friends, you know and I know if that was not true they would have had that waitress here to prove that was a bare lie, but they didn't produce her but they ask you to believe that it is untrue and they won't even dispute it. * * * It wouldn't add anything to take Harry Ross, it wouldn't add anything to say yes, I didn't take it. The rest of them would say naturally the person who took the money would deny it, but I thought I would put on the one they didn't say took the money. They did say Joe Duquette took it, they didn't say Joe Duquette forced them to open the register or that Joe Duquette did anything but stand at the door there and when Marcheta went to go outside he was standing outside and he said get back in there.''

Part of the closing argument of the prosecuting attorney and the exceptions thereto appear thus in the bill of exceptions:

''Mr. Meck did attempt to make some explanation of why Harry Ross didn't take the witness stand. Now let's see what Mr. Meck has to say about the people not testifying. He says and he says it with

a great deal of emphasis and he shouted it almost, don't you have to believe if they don't deny, don't you have to believe if they don't deny something about this change out there? No one testified about the change out there except his own witness whom I wouldn't give a snap of my fingers for. You have to believe if you don't deny, don't you have to believe the charges made against that young man if he hasn't the nerve to take the stand to tell you he isn't guilty. Mr. Meck has undertaken to tell you why he didn't take the stand—he says he didn't take the stand because if he did take the stand he would have testified and say he didn't do it. Well, if you please, that's Mr. Meck's testimony and not Ross' testimony. I can tell you why he didn't take the stand, he didn't take the stand because if he had taken the stand I would have turned to his record here (Mr. Stickney picks up some papers lying on the counsel table) and interrogated him on it.

"Mr. Meck: Wait a minute. Objection to that and assign that as misconduct of the prosecutor.

"Mr. Stickney: Very well, he has already told the jury what this man's testimony would have been if he had testified.

"Mr. Meck: There has been enough misconduct here and it ought to be stopped.

"Mr. Stickney: Yes, you have been guilty of most of it. (The court called Mr. Stickney and Mr. Meck to the bench and talked to them not in the hearing of the jury).

"Mr. Stickney: (Continuing argument.) Ladies and gentlemen of the jury, as I was saying, simply this, that might it not have been possible that this defendant did not take the stand not as Mr. Meck

says because all he could have done was deny it, isn't it possible he didn't take the stand because he knew if he did take the stand he would have certain questions to face from the prosecuting attorney, certain questions that in the answering of which he might be embarrassed, isn't it possible he didn't take the stand because certain revelations would have been made to this jury about his past conduct—

"Mr. Meck: Object to that. The court ruled on that. I ask now that the court instruct the jury to disregard it.

"Mr. Stickney: I think that's proper.

"Mr. Meck: I assign it as misconduct again.

"The Court: Let the record show your objection. I will let it in as far as it went.

"Mr. Meck: Exception.

"Mr. Stickney: (continuing argument). I have been interrupted so many times.

"Mr. Meck: Now I want it understood I won't want to be understood as interrupting or anything, I don't have a right to do and I don't want Mr. Stickney to try to tell the jury that either. I am trying to defend these boys according to law and that's what I intend to do and they are entitled to that without any inference from the prosecuting attorney that I am doing anything wrong here.

"The Court: You have a right to interpose objections.

"Mr. Meck: And I don't want any inference from him either.

"Mr. Stickney: Is that all for the present?

"Mr. Meck: Until you start something again and then you will hear from me again.

"Mr. Stickney: (Continuing argument.) That

seems to be a very touchy spot for Mr. Meck, this question of what his clients might have had to testify to —

"Mr. Meck: He has no right to say that, that it seems to be a touchy spot. I ask the court to instruct the jury to disregard it. He seems to think he can convict these boys that way and I object to it. He is an officer of the law just as much as the court is.

"The Court: Overrule objection. Proceed.

"Mr. Meck: Exception.

"Mr. Stickney: I would like to have the court instruct Mr. Meck not to interrupt me so much.

"Mr. Meck: I have a right to object any time I see fit.

"The Court: It is rather difficult for the court to instruct him not to object.

"Mr. Meck: You stay within bounds and I won't.

"Mr. Stickney: If you don't object we will get along better.

"The Court: Address the jury, Mr. Stickney, and Mr. Meck will address me."

Other than the portion thereof above quoted, none of the argument of counsel was criticized, nor was any of it otherwise improper in any respect.

Article I, Section 10, of the Constitution of Ohio, provides: "No person shall be compelled, in any criminal case, to be a witness against himself; but failure to testify may be considered by the court and jury and may be made the subject of comment by counsel."

It was prejudicial error to direct the attention of the jury to papers in the possession of the prosecutor but not in evidence, thereby indirectly creat-

ing the impression that Ross had a criminal record not otherwise proven and was a dangerous character. There was nothing in the argument of the attorney for plaintiffs in error that warranted such an impropriety. The only excuse possible is the zeal of the advocate and his unqualified belief in the guilt of the accused. The comment authorized by the state Constitution does not contemplate or permit a substitution of argument for evidence, nor the introduction of evidence by argument. This was prejudicial and reversible error.

It may not be inappropriate to say that the bill of exceptions, from almost the first to the last page thereof, is replete with unrestrained table talk, a sample of which is above given, which bore no relevancy to the issues being tried. All of us being human, it perhaps is not to be expected that the conduct of any trial will be entirely devoid of personalities or assumed repartee, but it does seem that it ought to conform, at least somewhat, to the ethics of proper procedure, which, although well understood and abstractly approved, are all too frequently not observed.

*Judgment reversed.*

WILLIAMS and RICHARDS, JJ., concur.